The case we're going to call 216-0171, People of the State of Illinois v. Willie B. Burnett, Jr. Arguing on behalf of the people of the state of Illinois in his last oral argument after close to 40 years in representing the state of Colorado. Prosecutor, Mr. Marshall Stevens. Thank you. Mr. Rogers, you may proceed. You're not retiring soon, are you? That's not a hint. No comment. That's how this goes, maybe. Good morning. May it please the court, counsel. My name is Paul Rogers. I am with the State of Illinois Defendant's Office. And we have been appointed to represent Mr. Willie Burnett, Jr. As you know, there are two issues in this appeal. The first issue raises an ineffective assistance of counsel claim, and the second addresses or involves an excessive sentence claim. I'd like to start by addressing the ineffective assistance claim and, in a nutshell, the argument of this. Attorney Schaffer provided ineffective assistance under the Strickland Standard, while unreasonably failing to call Dr. Lichtenwald to testify at the hearing on a motion to suppress, or even make the judge who presided at that motion aware of Dr. Lichtenwald's finding that the defendant had experienced a brief psychotic episode on May 19, 2014, the day he confessed. May I follow up on that? It's clear there for the record, though, is it not, that the attorney did talk to Lichtenwald? Yes. At some conference prior to the suppression hearing. Right. So we have that. So this isn't a case where it can be argued that the attorney simply didn't even bother to consult with the prospective witness. So if that's the case, isn't there also a presumption that the challenged action was the product of trial strategy? So if the attorney talked to the witness and didn't call the witness, what is there in the record that allows us to overcome that presumption that this was a matter of trial strategy? What compels us to, what requires us to make that finding that it was over public? Right. Your Honor, this preempted really a preemptive strike that I had in mind. I was certainly anticipating that question because that's really the elephant in the room here, and I certainly plan to address that. My contention would be that that elephant, to continue the metaphor, isn't quite as heavy as it seems. If you look at the record, we have two questions here. Why is it unreasonable and why is it prejudicial? It's unreasonable because the choice to rely on the video without making Judge Engelsma, who was unaware of the fitness evaluation, because that was really presented to Judge Wilt, without making Judge Engelsma even aware that Dr. Lichtenwald had made this finding, Judge Engelsma had only the video to go on. In other words, Attorney Schaefer put all of her eggs in that basket of just relying on, look at the video, you can see that he's too anxious to voluntarily be knowingly waived his Miranda rights. There really was nothing to lose by calling Dr. Lichtenwald or some other expert, if she was able to find one, to at least get his findings in the fitness evaluation on the record and use that to whatever extent she could in support of the motion. Without an expert, she was going to lose the motion. So, in other words, having an expert was her best chance, maybe her only chance, of getting a favorable ruling on the motion to suppress. If we're assuming that the expert and Cross wasn't going to say something that would have tipped the scales against the defendant, again, we don't know that. We have this presumption, and we know at least she talked to the witness. Normal counsel, the witness is going to be favorable, as you say, would have nothing to lose. Perhaps there was something that strategically caused her not to call the witness. So we still have this elephant looming in the room, don't we? Well, that's true. We don't know what Dr. Lichtenwald would have said on cross-examination. We don't know what she would have said on direct. Well, I say that because, from what I can tell, the brief psychotic episode that took place took place while he was in custody, not allegedly when he supposedly committed the crime. So in order to follow your syllogism to the very end, you have to, I think, correct me if I'm wrong, that not only did he experience a psychotic episode while in custody, that would tend to prove that he also, even though it's not mentioned, had a psychotic episode when he supposedly murdered Tilson. Well, the motion to suppress was, we're not talking about an insanity defense here, we're talking about a motion to suppress the confession. And the theory behind the motion to suppress the confession was that because of his anxiety and possibly withdrawal from Xanax, he was in no shape to... Well, I plead ignorance to the extent that I'm not well-versed in knowing what psychotic episodes are, especially if they don't relate to a science fiction television show. We can take judicial notice of that. So my point is, there doesn't seem to be anything in the record to suggest what you just alleged, which is psychotic episodes are evidence of involuntary or incompetent confessions. Well, that's exactly why you need an expert to call Dr. Lincoln while I'm having him testify and explain why did you come to this conclusion, what is it... Dr. Lincoln's fitness examination and fitness evaluation clarified that his conclusion, that finding was based, at least in part, on having observed the video of the May 19th interrogation. So the questioning would be, well, what is it about that video that makes you think he had a brief psychotic episode and did that affect his ability to understand Miranda warnings and to voluntarily waive them? So it was at least worth exploring. And perhaps this goes more to the prejudice angle, but Judge Engelsma presided at the motion to suppress, but it was not privy to the psychotic episode. As far as the record shows, to the findings in the fitness evaluation commented on the absence of an expert testimony ruling against the motion to suppress. I think prejudice actually is pretty easy to follow if you... Are we on a slippery slope if every motion to suppress a confession needs expert testimony to establish whether or not expert testimony is necessary to establish whether or not a psychotic episode occurred? Or any other type of episode or deficiency would disqualify or invalidate the confession? No, I don't think we're saying that in every case, but in this case you've got a fitness evaluation that the attorney had. She knew that it contained a reference, a finding, that Mr. Burnett had suffered a brief psychotic episode on the day he confessed. So under those circumstances, I think it's incumbent to follow up on that and call and present the expert testimony. At least elicit undirected examination. I don't want you to prepare a fitness evaluation if you came to this finding. Just for the record, you aren't claiming that counsel was ineffective for failing to seek a competency hearing based upon the fact that the attorney was aware that there may have been a psychotic episode. When you say competency, you're talking about fitness to stand trial? Fitness, yes. Well, that had been determined by Judge Wilt based on the report. Despite having found that Mr. Burnett had undergone this brief psychotic episode on May 19th, Dr. Lichtenwald found, after evaluating him a couple months later, that he was fit to stand trial. Judge Wilt knew that. Everybody knew that. What Judge Engelsma didn't know is that in the fitness evaluation, there was this reference to brief psychotic episode. So at the very least, I think Attorney Schaffer should have made Judge Engelsma aware of that finding, or alternatively, and then argued, we have a finding here that there's a brief psychotic episode on the same day that he confessed, and make the best argument that she could that that, to interpret, would have been a psychotic episode. But I think the video itself, in light of that finding, that that's a lens through which you can view the video, or call Dr. Lichtenwald and just have him say what he put in his fitness evaluation, and then it would go from there, and where it would go, we don't know. And that's the element I was talking about earlier. One other thing, just to say about that point. If this Court finds that the record as it stands is insufficient to find ineffective assistance because we don't know what Dr. Lichtenwald or any other expert would have said if called to testify, or so that we can determine whether it was unreasonable not to call him or to present such evidence, or there may be prejudices flowed from that, I'd ask the Court to take up, I think, what the State essentially suggested, in its view, the evidence. And Dr. Lichtenwald, I'm sure you can agree with that this is an issue that can still be, don't close the door on raising an innocent in a post-conviction petition, where perhaps the record can be, a better record can be, a more complete record can be established. Well, if we say something to the effect that the arguments, in order to be persuasive, must be contained within the record, and if we determine that the record doesn't contain such persuasive evidence, then wouldn't that imply that post-conviction petitions based upon things outside the record are not sufficient? I guess I just wanted to be clear about that, that if this Court rejects the ineffective assistance claim on direct appeal, to make it clear that the door is open for that claim on a post-conviction petition. So, did I answer your question? Is that what you were asking? Well, mine was a rhetorical question. Okay. So, you answered it in an inappropriate manner. Okay. I think, I don't know that we have any more questions, if you want to get to the sentence. Yeah, that's fine. I'm prepared to do that. And I can really do that fairly quickly. The sentence now, when you do the calculations, he'll be out at age 95. If, as we ask, you reduce it to the minimum of 48 years, he'll be out when he's 79. So, you're talking in practical terms, 69. Obviously, he'll be elderly at 79. Less elderly, yes. Less elderly than at 95. So, I have this question running through my mind. Isn't this part, inherent part of the Illinois statutory scheme and the criminal code we have now? Yes. Or even under the circumstances as I read the statute, the minimum sentence would have been 45 years, correct? Yes. Well, 48 when you count the... 48, right. Yeah. So, if somebody, you know, is under 40 years of age, it's almost tantamount to a light sentence. I can't dispute that. But why is that? Isn't that more of a function of our sentencing scheme than the judge imposing an excessive sentence? That's one way to look at it. I think this Court's becoming familiar with the sort of the triple effect of truth in sentencing, gun enhancements, and mandatory consecutive sentencing. That's not what I'm here to talk about today because you still have discretion within that range. The discretion is constrained by what the legislature sets. So it's your position that anything more than 45 years is an abuse of discretion? Because if the minimum isn't an abuse of discretion, but may be unconstitutional, then anything above the minimum you, I think, would logically argue is an abuse of discretion. Well, we've asked for a reduction to the minimum. This Court certainly doesn't have to find that it has the power to reduce it to something... Well, how can we find that it's an abuse of discretion when the minimum sentence has been imposed? The minimum sentence wasn't imposed. Okay. You got 65 years, which is 17 years more than the minimum. Okay, it was clearly over the minimum substantially. Right. But in this case, one of the things that seemed to influence the judge, the judge, the sentencing judge, was he found the defendant was involved in dealing with drugs for years. Isn't that an aggravating factor? It is an aggravating factor. The judge put a lot of emphasis on deterring other people from pursuing similar lifestyles, and I think that's legitimate. But you have to consider the consequences. That's just one factor. And this is someone with minimal criminal history, one prior felony, no history of violence. At age 79, the marginal difference between this being dangerous at age 79 and this being dangerous at age 95 is virtually zero. He's not likely to go back and pursue that same lifestyle. The use of the gun is built into the minimum. One other point. Both at trial and, I believe, on appeal, the state has argued and characterized this as a premeditated murder, and I would dispute that. I know my time's up, but if I can just complete the thought. The trial judge never found that. There was a general verdict. One of the counts was intentional murder. Let's assume it was an intentional murder. Not all intent is not the same as premeditation. And this was really just a theory the state had at trial, that Mr. Burnett, with the help of others, lured the victim to the location where the crime occurred. They never really proved that up. The defendant refused to implicate the others, both in his May 19th statement and just by a trial. In other words, there wasn't a third-party witness in the vehicle that could justify that an argument ensued? Well, Mr. Burnett, I don't think he characterized this as an argument, but that there was a discussion about some tension, at least, between himself and the victim. That was his statement, especially in his May 19th statement, and that that sort of was the final straw, really, that drove him over the edge and made him act. But this wasn't a plan. It wasn't a conspiracy or something close to it? The state certainly didn't prove that. That was their theory. But in his May 19th statement, Mr. Burnett said this was bothering him. He had this tension. He asked Mr. Tilson a question, trying to resolve the tension. He didn't get a satisfactory answer. He made a somewhat spontaneous decision or impulsive decision to shoot. His testimony at trial was it was self-defense. In fact, he got a second-degree murder instruction based on a perfect self-defense. So under either of the defendant's versions, this isn't something that he planned out and premeditated, I think, in the sense that the state is trying to portray. So I just wanted to make the Court aware of that. So just to conclude, I'd ask, based on the ineffective assistance argument, to reverse the conviction and remand for a new trial, or otherwise to grant Mr. Burnett a sentence reduction. You'll have an opportunity to make the call. Thank you. Mr. Stevens? Well. Are you going to Florida? I haven't decided yet. It came up pretty quickly. But good morning, Your Honors, for the final time. I think Mr. Manning said that you've been doing this for 40 years. It will be 38 years and 11 months by the end of the year when I'm retiring. Are you the most senior member of the appellate prosecutor's office? I don't think quite. Okay. But I'm up there. Thank you. You may proceed. Thank you. Honestly, your questions, Mr. Rogers, anticipated my comments. With respect to the first argument, does Dr. Lichtenwald's comment, Ray, the psychotic episode? Well, if you were his trial attorney, would you have called Dr. Lichtenwald? Depends on what Dr. Lichtenwald would say. I have no idea what Dr. Lichtenwald would say. We do know from the record that Ms. Schaefer spoke, conferred with him a couple of times. It turned out that she related to the court that he was unable or unwilling to testify, and he was going to get in touch with another doctor. I think there were like three instances in the record when this was mentioned. So she was clearly aware of the issue. Is fitness to stand trial and competency to render an admission of guilt different levels of intellectual quotient or IQ, or is there any comparison, parallel relationship between fitness to stand trial and competency to giving a confession? You know. I'm not, if you know, because it seems to be a rather novel thought. You know, are there different levels of competency relative to defending against a state's criminal complaint? And if so, which is the lesser? Is fitness to stand trial a lower standard or a higher standard? Do you have an answer to any or all of those questions? Do you want to go back down, sit down, and come back up? Well, maybe in another 39 years I'll have an answer. Oh, okay. The tests are in there for the purposes that we have here. I was content to just say we don't know enough about what Dr. Licknewell would say, to say that there is no trial strategy where you would not call him. You're suggesting that the record doesn't support the conclusion that failing to call the doctor to give an opinion would have detrimentally affected the hearing to the extent that the change would most reasonably have a probability of a different conclusion. It could have the possibility of a worse conclusion. Keep in mind, we're considering something that she hasn't done. We're looking at it from hindsight. You don't have to prove the negative. All you would have to establish is that the appellant hasn't proven the affirmative. I'm a little lost now. We don't have a doctor that Licknewell would say. My point was, could there be a reason not to do it? The premise was there's no logical reason not to call him. That's wrong. If I talk to Dr. Licknewell and he says, I don't know what I was smoking that day. He was perfectly competent. There's no issue about it. I know two other experts who would say, sure, of course he was competent. Oh, by the way, he premeditated it. I don't know what he's going to say. That's the whole point. You can't say in this complete vacuum of information that there's no reason that I wouldn't call him based on this very brief statement. He more likely than not had a brief psychotic episode. I think you commented that you don't know what a brief psychotic episode is outside of science fiction. Science fiction television series. Where maybe the fourth or the fifth episode, somebody had a psychotic episode. Well, yeah, but then they usually, you know, it was either a dream or somebody made them do it. Would that then mean that Bob Newhart, when he came to the final show, experienced a psychotic episode and all that went on before never really existed? Wow. This is heavy stuff, isn't it? That's existential to the degree I am. Well, if that's what a psychotic episode is, then it definitely is substantial. Well, again, I would have to say we just don't know. But as I point out in the brief, if you look at some references, it's a very variable thing. There are certain diagnoses, even to say what a psychotic episode is. What's your comment about Mr. Rogers' comment about whether or not, and I think he said that you suggested it, so probably you ought to agree with the rhetorical question that I'm asking you now, which is how does this affect the post-conviction petition insofar as waiver or res judicata is concerned? Because your argument is that the record doesn't support their position. So if that's the case, then how will the post-conviction… That's it. But it doesn't preclude a post-conviction petition. No, of course not. Even if we don't make a specific comment, because, again, it's yours, the record. It's outside the record, so… How could you comment on it? It would fall within the scope of the post-conviction. I've made some foolish comments in my life before. I'm sorry? You said we wouldn't comment on it. Oh. Anyway, well, the point is that somebody made a request for it, so unless the comment is prohibited, I don't think we can exercise our discretion. Can't we? I don't think it would be a topic for a comment in your session. Well, I know I've seen, if I haven't written them, I've read them, prior dispositions where the disposition indicated that this would be fertile ground for a post-conviction petition. You've never seen that? Well, I have seen a lot of commentary and opinions, I must say, over the years. Whether it's necessary or not, it's not precedential, and it may be advice. It might be law of the case, though, wouldn't it? It might be law of the case, maybe not because it's a collateral proceeding, therefore, it's not necessarily the case. There you go. Boy, this is turning into a conundrum. Huh? It's turning into a conundrum. No, I don't think so. I think it's pretty simple. There's just no evidence, and there's no need to go there. Do you want to address the sentencing issue? Sure. Sentencing is basically a matter of discretion. There was no indication that the judge applied the relevant sentencing provisions incorrectly. So we have a question here. Is it an abuse of discretion to sentence the defendant to 65 years versus 45 years? Is in the record that would suggest that an additional 17 years would be appropriate? As the judge noted, the defendant had a long-term history of involvement in drug trade, which is known for having a violent, being a violent milieu. And I would also say that it was, I think, a pre-planned murder that was based on the defendant not liking that Mr. Tilson aggravated him. By saying that his drug business would not be as good, Mr. Tilson had made certain introductions. I think that that's a fair inference. If you consider the events, they were supposedly going for a drug deal, but not that the defendant arranged it. But there was no drug deal that happened. It seems that they just went to kill Tilson. Was it mitigating that he confessed? Or was there sufficient evidence in the record that it wouldn't have made any difference? Well, I think there was sufficient evidence in the record. Terrence Bell and Kenyatta Bravo were in the car behind, and they narrated the events that they saw. Let's see. Bell heard gunshots from Tilson's car. He saw a muzzle flash from the defense gun. Only one gun fired. Tilson didn't return fire. In Brown's testimony, it was similar. The physical evidence, if you've seen the pictures, Tilson is sitting belted in his car, reclined, with a phone on one side and a stereo remote on the other. There's only the shell case, the bullets and fragments, whatever, found from one gun. There's no evidence that there was a return fire from the physical evidence. And the defendant's testimony was not very credible. He stated an essential part. When he reached for his gun, he took it. I jumped out and shot with mine. So he shot after he took the gun, according to that statement. And then he folded his gun. I probably shouldn't have shot him, but I'm not fast. And I'm thinking, I don't want to die tonight. What if he runs me over? So now he's going to run me over. So it's just not very credible. On a cross-examination, the prosecution pointed out that Tilson had the remote on his lap. And then the defendant said, oh, well, the gun must have been under his lap. Did the police find any firearm? No. They didn't find either firearm, is that correct? They didn't find the defendant's firearm. They never found a firearm that belonged to the defendant that had the ability to be matched to the forensic evidence of the empty cartridges or possibly the bullets. Correct. They did not find the gun that killed Tilson. And the defendant suggested that a .357 Magnum that was found in Bell's house was one that he'd given him, but that scientific testing showed it wasn't. So, again, Bell denied it. So there were empty shell cases in the – I'm sorry. I don't recall that. It couldn't be because if it's a .357 Magnum, there couldn't be shell casings. So it would have to be for evidence. There's only one firearm that I'm aware of that shoots .357 Magnum straight-walled cartridges that's semi-automatic that will eject an empty cartridge. All the other ones do not. Correct. Unless, of course, you hit the ejector. You open a cylinder and hit the ejector. But be that as it may. Yeah, that doesn't seem very likely, does it? Okay. Mr. Stevens, does it appear that the court ignored the mitigating factors in sentencing the defendant? There's no evidence of that that was suggested. I don't think it was suggested by the defense. Is the difference between, what, .45 and .65? I think, did we decide? There's .45 and .65. Would his exercise of discretion for that 17-year difference be justified by the defendant's involvement in drug trade? And the seriousness of the offense, this was someone who was a friend. And wasn't expecting it. I think that seems like a reasonable difference. When you say the seriousness of the offense, isn't that a factor inherent in a murder conviction? Murders are always serious. But there are murders that are done in the heat of passion. There are various degrees. What I need to suggest by that is this didn't seem to be a planned event. The defendant had them in two cars. They went to a particular isolated location for a purported drug deal. But it seems as if you could reasonably infer that this was planned in advance and not a heat of passion or spur-of-the-moment kind of thing. Did the sentencing judge make that inference? I don't recall that that was the case. Thank you. Thank you very much. For this argument and for 39 years of the pleasure of your company. It really is quite an honor to be involved at this level. And it's something that most attorneys don't have the privilege of and joy of having done. Thank you. Thank you. Mr. Rogers. Thank you. I'll just limit what I'm going to say to the excessive sentencing argument and focus on Mr. Steele's argument that, continued argument, that this was premeditated. Again, I don't think the record supports that. I think the record supports that. I think it conflates a little bit Mr. Burnett's motive, possible motive, for this. Namely that he was upset with Mr. Tilson, that there was some tension about their business relationship in those terms. But even if you look at the confession, repeatedly Mr. Burnett emphasizes that he didn't really even know what he was going to do until he actually did it. And if you look at it as a whole, he gives the impression of, this was weighing on me. He thought about it, but he wasn't sure he was going to do it. And then when Mr. Tilson doesn't respond in what Mr. Burnett thinks is an appropriate way, Mr. Burnett kind of snaps. And I don't mean that he had a psychotic episode, but that he just, that was when he said, or he just made, he took the action that brings us here today. Obviously his testimony is not anything supportive of premeditation, because that was self-defense. So I urge you to take a closer look at the confession, the transcript of the confession, in which Mr. Burnett explains that he was essentially undecided until the very moment of taking the shot. But the fact that he was undecided, though, doesn't do away with the fact that obviously he had been giving this some thought and some consideration prior. It's not like it's a spontaneous thing that just happened. I don't think that it's premeditated in the sense that this was a calculated, well-thought-out plan involving Mr. Brown and Ms. Brown and Mr. Bell. And just in that connection, I think Mr. Stevens said that the defendant arranged the deal and that there really was no deal. That was, again, the State's theory of trial. I would note, Bell testified. Kenyatta Brown said they had to make the run. Kenyatta Brown testified. Bell, whose nickname was Dalla, directed her to the scene. I believe in his statement on May 19th, Mr. Burnett said Ms. Brown knew where to go or to somehow led to that neighborhood. And I think there was also some confusion for discrepancy about exactly who said that the deal had been set up. So, again, I think if you look at the record closely, that this doesn't support the finding that this was some kind of premeditated plan. And I also don't think I certainly agree that any murder, certainly a murder involving a gunshot, is a terrible thing. But it doesn't rise to the level of being exceptionally brutal to the point of deserving so much additional time. Would you like to opine as to whether or not there are different levels of competency vis-à-vis fitness to stand trial and fitness to give a confession? I'd be happy to do that. To be honest, I don't know whether there – I don't think you can compare them as different levels because you're comparing – you're talking about different things. Competency to stand trial refers to – let's say, well, in this case, the evaluation was done in July or August, I think, of 2014, 15, which was a few months after the episode occurred. So – and a few months after the interrogation had occurred. So the question that Dr. Lichtenwald had answered was, July, August, is this person fit to stand trial now? The other question is, back three months ago, was he competent to waive his Miranda warnings? Nobody was ever asked to make that evaluation. So it's really a question of, you know, evaluating somebody's mental state at different times. And I'm sure the Court knows what the standard for fitness is and what the standard for – Well, the standard at different times, insofar as this particular individual may change, but I was asking more in the abstract, which is, regardless of whether or not his mindset may have changed, is there different levels of competency such that he might not have been competent because he was under a defect at that time, but now he's healed, which is your contention. But what if, at the time, the level to give a confession was lower than the level relating to fitness to stand trial, which means that we're now in no man's land or we're in a position where we really don't know one way or the other because if this is lower and he's only a – she's only – is it a she or a he? The Dr. Lichtenwald? Yes. It's Terrence, I think. What the doctor, when he opined as to fitness at a particular time, was not giving an opinion as to what the level of competency was at the earlier time. So we wouldn't know either under that circumstance, even if they were different levels. Well, they're different questions because fitness to stand trial, we all know, is can you cooperate with counsel and the other is damage to charge with, essentially. That's a completely different inquiry as to, under the totality of the circumstances, were you able to make a knowing and voluntary waiver of your Miranda rights? Well, it's an interesting – Obviously, it could change. It's interesting in the sense that it's created this hypothetical situation that has caused me enough concern to ask questions. Okay. Better not leave his hypotheticals floating in the air. This is always something I've wondered about. We talk about the difference between competency and fitness, fluctuating skills. At least for a long time when I was trying cases, I don't know if this is still the case, I was struck by the anomalous situation that somebody who was alleged to have been unfit could waive his right to a jury trial. He or she could waive their right to a jury trial. Is that still? I'm not sure about that. I'm pretty sure about this, that someone who is facing a fitness hearing can request – it has a statutory right to request a jury trial. So that somebody who's – and I guess that squares with the presumption that you're fit until you're found unfit. The question you posed, I don't really know the answer to. Well, the Supreme Court has opined that incompetence in civil proceedings can waive jurisdictional defects despite the fact that they're incompetent. So that is somewhat of a paradoxical syllogism that if you are incompetent, you can still waive something, especially something as defective as jurisdiction. That is an anomaly, but it's not something – it's not unusual to run into anomalies in the law. True. Thank you. We will take a short recess. There's another case on the call.